24-3086 Monica Gray v. State Farm Mutual Automobile Insurance Company, et al. Oral argument, 15 minutes per side. Ms. Knoll for the appellant. Good morning, Ms. Knoll. Good morning, Your Honors. Again, my name is Lara Knoll. I am co-counseling with my colleague, Daniel Bryant, and we represent Monica Gray, who is here with us today. May I please have four minutes for rebuttal? We need to clear something up from the get-go. Monica Gray did not make any false time entries. She did not. She worked within the time frame, within the system that Chris Martin had allowed for years. State Farm wants you to believe that they have this policy, this nationwide policy of timekeeping that everybody follows to the T. This policy does not even account for bathroom breaks. But the key thing in their own policy, at page ID 638, is that business areas will need to set expectations with employees regarding the usage of time clocks, taking into consideration work requirements, the location of the time clock, and the time required to perform any necessary initial or concluding activities. Which means that Chris Martin was within his supervisory rights to allow his team to work the time the way they wanted to. And he gave his team autonomy because he knew they were working. So you're acknowledging that she changed her time entries and that she was at lunch longer than she was supposed to be or she was away longer than she was supposed to be? No. I'm acknowledging that she made manual entries. And the court... A lot of people made manual entries, it sounds like. But she's the only one who was identified as doing it in a way that she was away from her desk longer than she actually said she was. And if you had that time up, it amounted to a pretty serious violation. Well, the problem with that is a couple of things. Within her job description, it said that she must mentor and assist other individuals that are younger than her or newer, which she did. Everybody knew she was a go-to person. Jill Dillon said it on the record. Sonia Mauter said it on the record. She was mentoring off the clock? I don't understand. No. No, that's part of her job description. People would come ask her and she would move to go do it. Just because she was not sitting right at her desk doesn't mean she wasn't working. She was helping other people, which she was required to do by her job description. Chris Martin, when he did not understand things, would say, just go ask Monica. Everybody knew that. That's why Sonia Mauter went to Monica Gray in the first place, because she knew how to find the information and to help out. What I am saying is as people made their manual entries, there was known issues with the time cards, but they didn't investigate. They didn't investigate when Monica said on the first day that she knew that there was an issue, and she didn't think she would get fired because she was doing the same thing everybody else was doing. She said, have you looked into anybody else's time cards? They blew that off.  Well, there's discovery in this case, so it's your opportunity to show there were comparators who were similarly situated who did the same things and weren't punished. My job is not to – I don't need to show that she did not falsify the documents. That's what the problem is. She recorded her time like everybody else did, and during that time they have this – I don't know. I mean, she recorded it incorrectly. She recorded – maybe I still don't understand the case right. It says Joe. It says Joe Kyle. Well, there's a separate investigation, and I thought the investigation revealed that she was away from her desk more than what she admitted to, and that, again, if you add that time up, it was a pretty significant amount, and that was a basis for the termination, and it's your opportunity to say that's pretextual because other people did the same thing and weren't punished, but that evidence didn't reveal that, I thought. That's what Judge Marbley kind of concluded. Because State Farm provided comparables that were across the nation for stealing time, none of which had to do with it. Nobody, nobody at the Newark facility was ever investigated, disciplined, terminated for this issue. Nobody. But here. I'm just trying to understand your argument. If I'm understanding you, you're saying like even if the record shows that they did an independent investigation and that she falsified records, she could still prevail in this case because other people were doing the exact same things. She told them that she was being singled out and they didn't investigate. Almost. So clarify that. Everything except she did not falsify. So is that, is your argument then dependent on that? If we were just hypothetically to conclude that there's not a material dispute of fact as to whether she falsified records, whether she recorded that she was in the building when she was really not in the building or things like that. If that's there, can you still prevail on summary judgment here? Well, here's the problem. Yes, we can. And the reason is that a couple things. The one that you're referring to, being out of the building, what's the most heinous about that example is she was standing next to Chris Martin and said, I have to step out and get the laptop from my husband. There, and in the executive summary, it says that they do not need to badge out of the building at the Newark facility. So she comes back in, badges in, and it looks like she's been out. There are 11 examples. Well, right. Three of them were maybe more justified, but I think you're acknowledging Shalom Katz's question that she did the things that she's alleged to have done. Not in the context that the court took it. Not in the context I feel like you're seeing it. There was never any falsification. This was a regular day. This is how Chris Martin's team functioned. Just because she made manual entries does not mean she falsified. The only way we get to falsified is if we believe Joe Kyle, because he said he's the one that started off the entire investigation by saying that he personally observed, page ID 1141, he personally observed Monica Gray taking long breaks in the system reflecting she was in lunch call state while she was away from her desk. Well, there were a lot of entries of 49 or 50 minutes, and I gather 50 minutes was the maximum allowed time for lunch. Is that right? And the reason why we're saying that this is normal, in our brief we went through at least two comparators, and it's a lot of documentation. On the dates that Mr. Kyle, the one date that Mr. Kyle looked at the time cards, Jill Dillon manually entered her meal time. Ten times. She rounded her time for manual entries 23 times. She had five end of shift manual entries and one start of shift manual entry. Does that mean that she automatically falsified? No, that's what Chris Martin said. You have to account for the expectations of her in this context. They are expecting her to help other people. First of all, she ate lunch at her desk all the time. Jill Dillon told you that in her affidavit. But if she has to step away from her desk to go help another person or help another manager, then she's going to be away from her desk. He did not ask. He did not look. He said because it was his first opportunity. What he did is he put a shot across the bowel, and he sat back and let it blow up. She was clocking out of the building, I gather. Is that right? Not all the time. Because it didn't work all the time. And they didn't have to badge out. It was not a requirement. In the executive summary, it gives you all the information. The executive summary specifically that Jerry Keeling did, the HR investigator, badge out is not required at the Newark Operations Center. So Mr. Bright and Ms. Flynn were the ultimate decision makers? Yes. And they were tainted by how this first started. The cat's paw theory. This is flat out the cat's paw theory. What does the cat's paw theory have? If we thought the prime facial case was created because maybe Kyle had some animus, but then everything gets kicked up to the senior individuals who look at this presumably on the merits and say the termination is appropriate for these numerous violations, how is the cat's paw theory then relevant? Well, number one, because the whole entire investigation started with Joe Kyle saying he personally observed her taking long lunches and manually recording. He said she falsified. He said she's lying. That's how it all started. So Flynn would agree that this is all true. But then it gets kicked up to the supervisory team. They find many more instances. And they terminate her for that reason. Well, there's two issues here with that. And they all ignored it. And they all said they didn't know. But they did because they got the executive summary. And the executive summary, it specifically states that Chris Martin did not know about checking the time on a specific way. It also says that Chris Martin acknowledged he was aware of an unrelated issue involving Kyle, but he said he didn't remember, just like he didn't remember her leaving. They also talked about she said she was being treated differently in that executive summary which was provided to these people. Everybody was on notice that there was two big reasons that they needed to look into this further, because it might not be falsification. And it wasn't just because she made this, just because these manual entries, just because Joe Kyle said does not make it right. Joe Kyle's credibility is at issue. He tried to do this exact same thing to Sonya Mowder, and it did not work. And so he went after the person that helped her. Okay. Thank you. I'll get your rebuttal time also. Thank you. Good morning, Mr. Hiller. Good morning. I want to address four things that an appellant just raised pursuant to your questions. First, an appellant claimed the only way that we believe that Monica Gray falsified her time is if we believe Joe Kyle. That's simply not true. Joe Kyle's belief about whether or not she violated rules and his proof of whether or not she violated rules goes by the wayside as soon as an independent investigator takes up the cause, independently confirms what he had reported, which is problems on three different dates. My understanding of your friend's argument here is, yes, maybe there was an investigation and they found discrepancies in her clocking out and things like that. But that was the practice of a lot of people, indeed maybe the practice of Chris Martin's entire team. And she's getting singled out. Our case law, which I'm sure you're very familiar with, doesn't allow, even if somebody is doing something wrong, that they're the one who's targeted or prosecuted because they've engaged in either a protected activity or because of a protected classification. So maybe you can address your argument to the singling out thing. And my understanding from the record is that she told them very directly that she was being singled out for helping Ms. Motter with the ADA accommodation, and we have that both in her declaration and in Mr. Keeling's meeting notes. Sure. So what you're talking about essentially is the argument that there was selective enforcement. What the facts are, and the record will reflect this, is that Joe Kyle investigated everyone who had T2 flags. T2 is the timekeeping system. And so it would throw up a flag and say, this needs to be investigated any time that there is a manual entry. He testified without. Did the decisions makers do that? You told me that Joe Kyle did. But what about the people who made the actual – Judge Riedler asked the people who made the actual determination. They're told that she's being selectively enforced against. Did they look at all the other people who had these flags? First of all, there was no – it's a vague assertion during an investigative interview. She said, well, other people round. She's not there for rounding. What we have in the record is that she was being discriminated against and treated differently because she helped Ms. Maurer with her 88 accommodations. That is in the record 42-1 page ID, 32-15. That's not very vague. We also have in Keeling's meeting notes that Keeling is acknowledging that Gray felt discriminated against and singled out, asked if her peers were being looked into given they make manual entries as well. Again, that's Mr. Keeling's thing. Nothing's vague about that. That's exactly the point. She didn't bring forward any examples of actual people engaging in the same conduct. There was nobody else. And here we are seven years later. Before discovery, just when she's in an interview, she needs that evidence. Sorry, I missed you. Well, you're saying she didn't come forward with examples at that time. In this December 12th interview, you're saying she needs the examples at that point. She didn't provide them on December 12th. They didn't terminate her until January 2nd. But she's not in a lawsuit and in discovery on December 12th. She's just being interviewed. She's saying this is a general practice of what's going on in Chris Martin's shop. I feel like I'm being singled out. What then did the decision makers do about that? Or you're saying they don't have to do anything unless she comes forward. Now, again, at this point, she doesn't have access to other people's time cards. There's no discovery. Well, she didn't give an example of another employee to look at. She didn't give an example of a day to look at. She didn't give an example of a time to look at. And even if she had, Your Honor, to your point, that's still just about rounding. It's not about people getting up and leaving the building and claiming they're at their desk. Imagine if you had two assistants. One of them is sitting there at their desk working but may be taking a long time to write an opinion or type up a document. The other gets up and leaves the building. And she's saying those two people have to be treated the same. A business can decide those are not the same thing. So her coming up with claims that So the policy, I think I understand your argument. The policy makes a distinction of whether, like, you're clocked in and you're not in the building so you're not working or you're clocked in and you're sitting in a cafeteria for a long time but you're in the building. The policy makes a distinction between that? Because either way you're not working, right? The policy doesn't need to make a distinction, first of all. The policy just needs to say this is a rule. For example, if it were as vague as saying you cannot steal time, that is sufficient to put people on notice you can't steal time. But arguably the person in the cafeteria is stealing time and the person outside of the building is stealing time. And she's saying I'm being singled out for stealing time. You're not looking at, I mean, maybe other people stole time in different ways. Think about this from the business perspective. You're the investigator. You're trying to prove one person was wasting time because they were in the bathroom too long or in the cafeteria too long, whereas somebody else was out of the building. What records can you look to? There's no record that tells you how long they were in the cafeteria. There is a record for telling you they're out of the building. And isn't there a record to see when they're on their workstation? Because you use those records as well. The only thing you have is the variant computer activity log which tells you are they actively typing. It doesn't show you what they're typing or doing. And to her point, it's not a problem. This is not a butts in seats rule. We don't have a rule that says you have to be at your desk the entire time that you're clocked up. That's not the rule, and it wouldn't be workable in any business. In fact, we encourage her to be sort of the roving Good Samaritan and help people, and she did, in fact, do that. That's not why we're here. We're not here because she was out of her seat. We're not here because she was in the bathroom or because of others being in the bathroom. The fact is she left the building and didn't just do it once to go get her laptop. I mean, if we zero in on that laptop example, I think it was at, like, 2.30 in the afternoon, and she had been working since, what, 8 in the morning? How do you claim you're working from 8 until 2.30 if you don't have your work laptop? So if that's her excuse, it proves her point. But let's take the excuse. That takes one incident off the table. You still have ten more, and that's the problem. That's what Judge Marbley zeroed in on, and that's what has not been explained. We have been waiting for substantiation of her working through cell phone records, through attesting witnesses. Yes, I was on the phone with her. She was working. She hasn't produced that in seven years. So that's why we're here. So I sort of, you know, employee in an interview situation while they're still working there, maybe they're not going to have a lot of evidence to come forward and say, well, this person was off. This person did this exactly on this day, and this person did it on that day. But there was discovery in this case. So what did discovery show about how other people were? I mean, were there other? My sense is there weren't a lot of comparators once it got to discovery, and I sort of asked your friend about it, but what was your take on that? I'm glad that you raised that, Your Honor, because discovery was thorough. There were numerous depositions, over a dozen of them. There were thousands of pages exchanged. There was not a single person that she could point to at the end of discovery who did the same thing as her of leaving the building while still clocked in, not one. And so her protestation that, well, nobody was fired at the Newark location really rings hollow because she can't prove that anybody else did the same thing that she did. Was there investigation at all, just on the record? Like when she said, I'm being singled out, was there any action? I know you said that you felt those statements were vague, but, I mean, after the fact and things like that, we can see in discovery, okay, maybe she couldn't find a good comparator. But I'm just curious, did anybody look into it at the time when she made the allegation? I don't think they had a way to look into it. One thing that happened after the interview was she went to Chris Martin the next day and tried to convince him that all of the time records were- I mean, they could have looked into other people just like they looked into her, right? They have time cards, they have when you're in the building, when they're not. I'm just asking, like, did they look at anybody else? Like, she said, hey, I'm being singled out. Did that raise any flag? Like, did anybody look at it? So they looked at the records that they had. About her. Right, and none of them demonstrated that anybody else had done the same thing. But they did at that point look at other people. It's my understanding that they looked at the entire team. They looked at the entire team and then found that she was doing things that other people did. And that was part of their decision then to fire her, is that they did look and compare before the termination decision. I believe Chris Martin said that he looked at his entire team and went back as he was trying to understand how this happened and how he had missed it and looked at all the T2 records.  What about your opposing counsel says the cat's paw theory should apply here. What is your response to that? Well, the cat's paw is cut off. The problem with the cat's paw theory is that that ends with an independent investigation and Staub v. Proctor Hospital, the Supreme Court, provided that if there's an independent investigation that looks into something, proximate cause is no longer connected. So here, Jerry Keeling didn't rely on the documents or the information or subjective beliefs of Joe Kyle. Instead, she fully investigated from December 4th until December 11th and not only confirmed the three dates that he had circled, but eight more. He being Kyle and the eight more, yeah. But we have cat's paw cases in our circuit I'm sure you're familiar with where we say, yeah, there was an independent investigation and this person did something bad. But if the employee was kind of put into the investigation based on animus, we don't allow you to use the cat's paw theory, right? Like we have this Chapman case where a lot of employees engage in horseplay, but only the black employee is put into proceedings for it. Now there's an independent investigation by the people who weren't the supervisor who instigated the investigation, and we said, no, still material question of fact on proximate cause, still material question of fact on causation. We don't kind of let it absolve all the discrimination, do we? No, we don't. But Chapman turned on whether or not the company had relied on facts provided by the biased influencer. And here there's no evidence that Joe Kyle's facts were relied upon by anybody. That's why Jerry Keeling went out. I mean the whole thing relied on Joe Kyle though. No, it didn't. Joe Kyle started it because he had a duty as a supervisor. Oh, he started it. So he's a but-for cause here. No, he's not. Proximate cause is completely cut off, and the but-for causation is completely cut off by the independent investigation. That's exactly what STOB provides. Is this all tied to the prime fascia case? Does the cat's paw theory have anything to do with the pretext? Once we get to the point of pretext, assuming there's a prime fascia case and we get to pretext, is there any relevance left for the cat's paw theory? Yes. If you get to cat's paw, you're really analyzing the pretext. She does have to establish a causal connection. Here she tries to rely upon close timing for the causal connection for the prime fascia case. So the close timing, this is where the district judge made a correct decision on pretext. He didn't make a correct decision on the prime fascia case because he actually ruled in her favor on that. We should have won on the prime fascia case because he relied upon her December 24, 2017 EEOC charge and the close timing to the January 2 termination, but skipped over the need to have proof that the decision makers had knowledge that she had filed that charge. There is no proof that any decision maker had that charge in hand or knew about it by the time they made the decision. In fact, by that date that she filed the charge, two people had already recommended an approved termination. So this is something that's already in progress. You can't stop it, and there's case law in the circuit on this as well. You cannot stop an in-progress termination by throwing out a discrimination allegation. It wasn't just about whether they knew of the EEOC charge. I thought they knew, though, that she was trying to help a co-worker with an ADA claim, and that's supposedly what aggravated Kyle. Yeah, there's no reason that that would aggravate Kyle because Kyle didn't make the accommodation decision. Kyle was simply the guy who had to inform Sonia Mauter that her accommodation had come to an end. The record is clear. He didn't make that decision, so why would he ever develop retaliatory animus because he simply had to make a communication and someone disagreed with it? Well, yeah, I mean, we're at the summary judgment. I mean, you know, he says he had no reason to have any animus, but her testimony is, well, he did have animus. He was annoyed with her. Well, okay, and so let's take that a little bit further. Where is his influence on the decision? He didn't influence the decision to terminate. He didn't recommend that they go to a level of termination. It's also four months removed from the termination when he is supposedly annoyed back in August and she's not terminated until January, and you have her intervening misconduct in the middle in November that breaks any causal chain there. I see that my time is winding down to five seconds. Thank you, Your Honors. Thank you. Ms. Null, you have four minutes. Yes. I think we need to jump right into the fact that Chris Martin didn't look at anything. Chris Martin didn't even know the system. Joe Kyle described him as dumbfounded at some of the things he said that he showed Chris Martin. So there is nowhere, nowhere in the record that says anything about anybody looking at anybody's time cards on Chris Martin's. So you have some obligation to show the – if we're getting to pretext, I think a lot of the discussion has been about the prime facial case, but if we're getting to the pretext, isn't then your obligation to show that they're lying about the basis for the termination because there are other people who did the same things and were treated differently? And I don't see that evidence in the record. Well, it's my job to provide a – to show there's a reasonable issue, a genuine fact, not to prove it. Who are your best comparators? Well, Jill Dillon. Jill Dillon specifically said, this is how I keep time too. I round. And understand the laptop is only at home. She explained some of these things, but you cannot go six weeks later and say, what were you doing for this four-minute increment? And she said she was helping. She said she was in the State Farm Policy. She would get calls at work. Does she have a pattern of changing her lunch breaks or logging in for time when she wasn't in the building? Because those are two different – She was – she went to get her laptop one time. There was no other time. None. One time. And she was standing next to Chris Martin when she did. I think Judge Reitler was talking about Dillon.  Did she step out at a family potluck during lunch and get the laptop from her husband? No. That's what happened. We have to look at these things in context of these workers who are hourly workers. Not me, who works for myself and can create my own schedule. Not you all, because you have lifetime tenure. I mean, these aren't our stresses. These are the things that a jury of our peers will understand and have the right. They know how this works. And the way this works is Joe Kyle's influence. And they said, no, no, he only reported it. Okay, well, 1167, Denise Hensley's notes with dates. They talk about 11 – November 30th, he reports to HR. 12-4, he's in a meeting with all – Joe Kyle's in a meeting with everybody. Joe shared what he found. Chris said Joe will interpret Verrant for him. He had influence on the whole thing. Just like in Breed, EEOC versus Breed, that supervisor was in the HR's ear the whole time. Joe Kyle was in their ear. He especially had Chris Martin. Chris Martin did not look at anything. And the causal connection, it was in August. October 17th is when Sonia Mauter went to – was moved to a different place. Monica Gray had her so prepped with information solely in the context of the ADA that when Sonia Mauter walked into Joe Kyle's office to confront, resist, oppose, it was Monica Gray with Sonia Mauter's face. That's how this went down. And he knew it. He said it. Monica, read the affidavits by Sonia Mauter. I told him, I told him, I told him, I told him. Jill Dillon, the day after her termination, they could have said, okay, we were wrong and brought her back. Jill Dillon told the HR representative when I – and this is page ID 3239. When I was asked about the reason for the meeting, the HR rep said he wanted to discuss what happened with Monica. I told him that Monica Gray was targeted by Mr. Kyle because everyone else handled time the same way as Ms. Gray. I also gave him names. I told him Ms. Gray would still be employed if Ms. Martin had not gone hunting. These are the things that Sonia Mauter said beforehand. And just because the higher-ups are alleging that they did not know, they had notice of it because it was in the executive summary that was sent to them by Denise Hensley when she was saying the decision is to terminate Monica Gray. Okay, thank you very much. Thank you, Your Honor. I appreciate both sides' arguments, and the case will be submitted for decision.